Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Luis A. Feldstein, State Bar No. 184824
lfeldstein@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700/Facsimile  (949) 369-3701

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GERALD L. WOLFE, <br><br> Defendant. | Case No. SA CR 10-191 <br><br> **DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING POSITION** <br><br> DATE:  April 16, 2012 <br> TIME:  1:30 p.m. <br> DEPT:  10D <br><br> Honorable Andrew J. Guilford |

# TABLE OF CONTENTS

Page(s)

I.    AT SENTENCING, THE GOVERNMENT HAS THE BURDEN OF PROVING THE LOSS AMOUNT BY CLEAR AND CONVINCING EVIDENCE AND THE OTHER TWO PROPOSED ENHANCEMENTS BY A PREPONDERANCE OF THE EVIDENCE. ..................................... 2

II.   THE GOVERNMENT HAS FAILED TO PROVE THE LOSS AMOUNT BY CLEAR AND CONVINCING EVIDENCE..................................... 4

III.  THE LOSS AMOUNT MUST TAKE INTO ACCOUNT A DECLINING REAL ESTATE MARKET AND LENDERS' FAILURE TO MITIGATE THEIR LOSSES THROUGH SHORT SALES DESPITE MR. WOLFE'S PLEAS. ..................................... 10

IV.  THE GOVERNMENT HAS FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE NUMBER OF VICTIMS IS 10 OR MORE. ..................................... 12

V.    THE GOVERNMENT HAS PRESENTED NO EVIDENCE TO SUPPORT A RESTITUTION AWARD..................................... 13

VI.  THE COURT SHOULD EXERCISE ITS DISCRETION UNDER 18 U.S.C. § 3553(A) TO SENTENCE MR. WOLFE TO PROBATION OR A MINIMAL TERM OF INCARCERATION. ..................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................... 19

*United States v. Andrews*, 600 F.3d 1167 (9th Cir. 2010) ................................. 14

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ..................................... 16, 17, 18, 21

*United States v. Crandall*, 525 F.3d 907 (9th Cir. 2008) .............................. 8-9, 11

*United States v. Curtis*, 635 F.3d 704 (5th Cir.), *cert. denied*, 132 S. Ct. 191 (2011) ............................................................................................................ 8

*United States v. Dare*, 425 F.3d 634 (9th Cir. 2005), *cert. denied*, 548 U.S. 915 (2006) ........................................................................................................ 2

*United States v Davoudi.*, 172 F.3d 1130, 1135 (9th Cir. 1999), ....................... 11

*United States v. Edwards*, 595 F.3d 1004 (Pregerson, J.), *rehearing en banc denied*, 622 F.3d 1215 (9th Cir. 2010) ..................................................... 16, 17, 19

*United States v. Gordon*, 393 F.3d 1044 (9th Cir. 2004), *cert. denied*, 546 U.S. 957 (2005) ................................................................................................. 11

*United States v. Gossi*, 608 F.3d 574 (9th Cir. 2010) ......................................................................................... 6, 11

*United States v. Hicks*, 217 F.3d 1038 (9th Cir.), *cert. denied*, 531 U.S. 1037 (2000), ...................................................................................................... 11

*United States v. Jenkins*, 633 F.3d 788 n.8 (9th Cir. 2011), ............................. 2

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 969 (2011) ..................................................................................................... 9

*United States v. Lawrence*, 47 F.3d 1559 (11th Cir. 1995). .............................. 3

*United States v. Lieberman*, 971 F.2d 989 (3rd Cir. 1992) ................................ 20

*United States v. McHenry*, 974 F.2d 1031 (9th Cir. 1992) ................................. 5

*United States v. Olbres*, 99 F.3d 28 (1st Cir. 1996) .......................................... 4

*United States v. Shaw*, 3 F.3d 311 (9th Cir. 1993) ........................................... 8

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

**TABLE OF AUTHORITIES: (continued)**          **Page(s)**

*United States v. Snipe*, 515 F.3d 947 (9th Cir. 2008) ..................................................... 3, 15

*United States v. Stewart*, 2007 WL 56714, at *1 (5th Cir. Jan. 9, 2007)............................ 13

*United States v. Yeung*, 2012 WL 432289 (9th Cir. Feb. 13, 2012) ....................... 6, 13, 14

**Statutes**

18 U.S.C. § 371 ................................................................................................................ 20

18 U.S.C. § 1349 .............................................................................................................. 20

18 U.S.C. § 3553(a) ............................................................................ 2, 12, 15, 16, 17, 18

**Sentencing Guidelines**

U.S.S.G. § 1B1.3 .............................................................................................................. 10

U.S.S.G. § 1B1.3(a)(1) ..................................................................................................... 10

U.S.S.G. § 2B1.1 ........................................................................................................ 10, 12

U.S.S.G. § 2B1.1, cmt. n. 1 ............................................................................................. 12

U.S.S.G. § 2B1.1 cmt. n.3(A) ............................................................................................ 8

U.S.S.G. § 2B1.1 cmt. n.3(B) ............................................................................................ 9

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO DEFENDANT'S
SENTENCING POSITION

At the initial Sentencing Hearing on January 23, 2012, the Court granted leave to the Government to file a reply brief addressing a discrete set of questions posed by the Court during the hearing and gave the defense an opportunity to respond.  The questions were as follows:

- On which facts may the Court properly rely in determining loss and fashioning a sentence for Mr. Wolfe, given that the jury did not specify a factual basis for its verdict and the Government has the burden of proving all the facts on which any sentence must be based?  *See* Sent. Hearing Transcr. at 19-20, 22, 48-49, 53.

- How, if at all, did Mr. Wolfe plan to "get rich" from the scheme?  *See id.* at 25.

- Did Mr. Wolfe profit from the scheme and, if so, to what extent?  *See id.* at 23, 26-27.

- How should loss be calculated in a declining real estate market?  *See id.* at 23.

- To what extent should the loss amount be reduced to account for the lenders' failure to mitigate their losses through short sales and other means available to them?  *See id.* at 30-32, 39.

- How does the fact that not a single lender has sought restitution affect the Court's calculation of actual loss for purposes of sentencing and restitution?  *See id.* at 60.

In response, the Government has taken the liberty of filing a 49-page brief (the "Government's Reply Brief") – nearly double what is allowed even for opening briefs – without seeking the prior consent of either the Court or the defense to exceed the page limit.  For all the pages it consumes, however, the Reply Brief avoids most of the Court's questions and instead regurgitates the same arguments made in the Government's original sentencing brief.  Together with its earlier, 19-page brief, the Government has now filed 68 pages of briefing in its pursuit of Mr. Wolfe.

The defense will not respond in kind to the Government's effort to re-present its case at sentencing.  Defendant's Amended Sentencing Position ("Defendant's Sentencing Position") provides the Court with ample legal and factual grounds to conclude that a sentence of probation or, at most, minimal incarceration is "sufficient, but not greater than

necessary" to achieve the objectives of sentencing set forth in 18 U.S.C. § 3553(a).  To the limited extent that the Government's Reply Brief purports to answer the Court's questions, the defense will respond without surrendering to the temptation to refute or correct every single one of the legal errors and factual distortions in the Reply Brief.  The defense respectfully requests that the Court strike all portions of the Reply Brief that go beyond addressing the specific issues on which additional briefing was authorized.

## I.   AT SENTENCING, THE GOVERNMENT HAS THE BURDEN OF PROVING THE LOSS AMOUNT BY CLEAR AND CONVINCING EVIDENCE AND THE OTHER TWO PROPOSED ENHANCEMENTS BY A PREPONDERANCE OF THE EVIDENCE.

The Court's concern over which facts it may properly rely upon at sentencing goes to the heart of why it should reject the Draconian sentence advocated by the Government.  Every one of the Government's proposed enhancements to Mr. Wolfe's base offense level relies on facts and inferences that were neither proven to the jury nor necessary to its verdict.  Against this backdrop, the Government has failed to meet its burden to prove the loss amount by clear and convincing evidence and has failed to prove by a preponderance of the evidence that the conspiracy of which Mr. Wolfe was convicted involved 10 or more victims or sophisticated means.

The greatest proposed enhancement by far – which is based on an alleged loss amount of $8.8 million that would almost triple Mr. Wolfe's base offense level of 7 – must be proven by clear and convincing evidence because it would have an "extremely disproportionate effect on the sentence relative to the offense of conviction."  *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005), *cert. denied*, 548 U.S. 915 (2006) (citations and internal quotation marks omitted).  While an exception to the clear-and-convincing standard may exist for disproportionate enhancements that are "based entirely on the nature and extent of the conspiracy, as opposed to acquitted or uncharged conduct," *United States v. Jenkins*, 633 F.3d 788, 809 n.8 (9th Cir. 2011), that exception does not apply here because the Government attributes two-thirds of its claimed losses to the 21 Ross and Franklin loans, which, as discussed further below, were not part of the same and

1  only conspiracy of which Mr. Wolfe must have been convicted based on the evidence at

2  trial.

3          The Government's loss calculation relies on the unsubstantiated allegation that Mr.

4  Wolfe knew about misrepresentations in the 21 Ross and Franklin loan applications.

5  However, the Government has presented no evidence to support this allegation, and even

6  the Government's star witness, Andrew Bohuslavizki, acknowledged that Mr. Wolfe had

7  no involvement in those transactions.  During the Sentencing Hearing, defense counsel

8  challenged the Government to include in its Reply Brief specific citations to the trial

9  record that would support its expansive interpretation of the jury's verdict.  *See* Sent.

10 Hearing Transcr. at 44-46 ("MR. BIENERT: . . . I think he is wrong where he says there

11 was evidence presented that would show Mr. Wolfe [knew] that the ten Ross properties

12 and the ten Franklin properties were based on false owner-occupancy.  And so I'd

13 encourage them to cite us in the transcript where that is, and then we'll have it or not.").

14 Not surprisingly, on this central issue, the Government's Reply Brief repeats the

15 allegation without providing a single citation to the trial record to back it up.

16         In applying the preponderance standard to the Government's other two proposed

17 enhancements, the Court must "make individualized findings concerning the scope of

18 criminal activity undertaken by [Mr. Wolfe]. . . .  Although not as rigorous as the

19 reasonable doubt or clear and convincing standards, the preponderance standard is not

20 toothless.  It is the district court's duty to ensure that the Government carries this burden

21 by presenting reliable and specific evidence."  *United States v. Lawrence*, 47 F.3d 1559,

22 1566 (11th Cir. 1995).  The Government cannot carry its burden simply by relying on

23 factual assertions in the pre-sentence report ("PSR").  *See, e.g., United States v. Snipe*,

24 515 F.3d 947, 955 (9th Cir. 2008) ("[W]hen a defendant objects to a PSR's factual

25 findings, '[t]he court may not simply rely on the factual statements in the PSR' to find that

26 the government has carried its burden.") (quoting *United States v. Ameline*, 409 F.3d

27 1073, 1086 (9th Cir. 2005)).

28

## II.    THE GOVERNMENT HAS FAILED TO PROVE THE LOSS AMOUNT BY CLEAR AND CONVINCING EVIDENCE.

Of all the sentencing issues facing this Court, perhaps none is as troubling as the Government's quest to nearly triple Mr. Wolfe's Guidelines offense level based on a monetary loss resulting almost entirely from conduct beyond the conspiracy of which Mr. Wolfe was convicted.  Based on the evidence at trial, the only plausible basis for the jury's verdict is that it concluded that Mr. Wolfe knew about owner-occupancy misrepresentations in the nine loan applications submitted in his own name.[1]  The maximum possible loss to original lenders as a result of those misrepresentations is $88,500, and even if successor lenders were included in the calculation (which they cannot be for the reasons stated below), actual loss still would not exceed $594,500.  *See* Def's Sent. Posit. at 9-12.  Although Defendant's Sentencing Position discusses other possible methods of calculating actual loss, the Government has not offered this Court any evidence to show that any higher amount was reasonably foreseeable to Mr. Wolfe.

Because the jury's general verdict was unaccompanied by specific factual findings, the Court must look behind the verdict, weigh the evidence, and make its own independent determination of the loss amount attributable to Mr. Wolfe based on clear and convincing evidence of his relevant conduct in the specific conspiracy he joined.  The loss amount may not be based on the factually unsupported conclusions that the Government or the Probation Office chooses to read into the verdict.  *See, e.g., United States v. Olbres*, 99 F.3d 28 (1st Cir. 1996) (vacating sentence where jury's general

---

[1]    The Government failed to prove that Mr. Wolfe knew about any other misrepresentations.  For example, the Government has produced no evidence that any appraisal was inflated, and the Government's fallback argument that sales prices were inflated without lenders' knowledge also fails because, as demonstrated by the cross-examination of Countrywide representative Lanisa Jenkins, lenders independently verified through their own appraisals that the sales prices reflected fair market value.  *See* Trial Transcr. Day 5 at 118:3-119:6.  Jenkins' cross-examination also served to disprove the Government's allegation that lenders were kept in the dark about cash back to Mr. Wolfe, whether in his own name or that of his company, Douglas Design.  *See* Trial Transcr. Day 5 at 114:3-17, 121:5-11.

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING POSITION

verdict did not specify the proportion of total loss that was willfully caused by defendants and the district court simply adopted the factual statements regarding loss in the PSR); *see also United States v. McHenry*, 974 F.2d 1031, 1033, 1034 n.4 (9th Cir. 1992) ("The problem in conspiracy cases . . . is deciphering the jury verdict to determine precisely what acts it believed the defendants committed in furtherance of the conspiracy. . . . [T]he court cannot determine the amount of loss in a conspiracy case until it knows precisely which acts underlie the offense of conviction.").

As mentioned above, the Government put on no evidence at trial – and fails to point to any such evidence in its Reply Brief – that Mr. Wolfe knew about any misrepresentations in connection with the 21 Ross and Franklin loans.  The use of "straw buyers" was not even mentioned at the Maggiano's meeting where the conspiracy supposedly was hatched.  In his testimony, Andrew Bohuslavizki could not point to a single conversation, let alone a conspiratorial agreement, that he or anyone else had with Mr. Wolfe regarding the purported use of "straw buyers."  Mr. Bohuslavizki also testified that Mr. Wolfe had no knowledge of what representations were or were not made in the Ross and Franklin loan applications.  *See* Trial Transcr. Day 6 at 217:1-10.  Donald Ross, the only alleged "straw buyer" to testify at the trial, was of no help to the prosecution's case because he acknowledged that he never had any dealings with Mr. Wolfe.  *See* Trial Transcr. Day 2 at 116:9-11; 144:18-25; 145:1-14.

In order to convict Mr. Wolfe, all that the jury needed to believe – and all it could have concluded from the evidence presented – was that Mr. Wolfe knew about owner-occupancy misrepresentations in the nine loan applications submitted in his own name. The maximum amount that lenders could have lost as a result of those misrepresentations was the sum of the down payments they might have required Mr. Wolfe to make if they had known that he was buying the properties as investments (although, as even Andrew Bohuslavizki acknowledged to the FBI, lenders at the time were routinely making no-money-down loans on investment properties, *see* A. Bohuslavizki FBI 302 dated May 17, 2010, at 6 (Ex. F to Def's Sent. Posit.) ("They could have got 100% financing on non-

owner occupied loans back then.")).  The evidence shows that no lender would have denied any loan outright and that the sole underwriting issues were the interest rate and down-payment amount.[2]  As a result, the maximum possible loss reasonably foreseeable to Mr. Wolfe is $88,500, and even assuming that successor lenders' losses were reasonably foreseeable to Mr. Wolfe (which they were not), the loss still would not exceed $594,500.[3]  *See* Def's Sent. Posit. at 9-12.

The Government's argument that successor lenders' losses satisfy the *James* standard because they *were* reasonably foreseeable to Mr. Wolfe relies on Mr. Wolfe's alleged actions and knowledge *after* the original loans already had been made, not before, and therefore have no bearing on the foreseeability analysis.  According to the Government, the fact that Mr. Wolfe paid the mortgages on the properties after close of escrow shows he "was aware" that successor lenders were servicing many of the loans.

---

[2]      For example, Jenkins testified that Countrywide approved a loan to Mr. Wolfe based on an application that disclosed that the property would not be owner-occupied and that Mr. Wolfe had more than $13 million in existing mortgages and liens.  *See* Trial Transcr. Day 5 at 181:9-24.

[3]      The Ninth Circuit's recent opinion in *United States v. Yeung*, 2012 WL 432289 (9th Cir. Feb. 13, 2012), does not alter the loss calculation for Guidelines purposes.  *Yeung* is strictly a restitution case holding that a successor lender's actual losses may be included in a restitution award only to the extent that the Government proves the lender was "directly and proximately harmed" by the offense.  *Id.* at *4.  In contrast, a successor lender's actual losses may be used to increase a defendant's offense level under the Guidelines only to the extent that the loss was "reasonably foreseeable" to the defendant, which is the same standard applied by the 10th Circuit in *James*.  This distinction is explained by the different purposes behind restitution and Guidelines loss:  Restitution seeks to make a victim whole whether or not the defendant could have foreseen the loss, while Guidelines loss seeks to punish a defendant for losses that reasonably could have been foreseen as a result of the offense conduct.  *See United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) ("Restitution clearly focuses on the victim, not the individual defendant. Restitution seeks to compensate the victim for all the direct and proximate losses resulting from the defendant's conduct, not only for the reasonably foreseeable losses.").  As held in *James*, successor lenders' losses are not reasonably foreseeable to a borrower who, like Mr. Wolfe, had no advance knowledge or input into the sales of the loans to those lenders. *See* Def's Sent. Posit. at 6.

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING POSITION

Gov't Reply Br. at 29. The Government also contends that the fact that Mr. Wolfe refinanced several properties shows he "was directly aware of issues relating to several of his loans being sold in the secondary market." *Id.* But what "issues" Mr. Wolfe did or did not become "aware of" *after* the loans were made has no bearing on what was foreseeable to him *at the time* the loans were made, so the Government's argument misses the point. The actions on which the Government relies to establish foreseeability in fact show nothing more than 20-20 hindsight.

At the Sentencing Hearing, the Court asked the Government how much money Mr. Wolfe actually made from the scheme, *see* Sent. Hearing Transcr. at 23, 26-27, which could have served as an alternative to actual or intended loss in the event neither one of these amounts was ascertainable. The best response the Government could offer after more than six years of investigation was that it did "not have that number right now," but that the Court could choose to treat the $2.2 million in "cash back" from the loan proceeds as Mr. Wolfe's gain. *Id.* at 27. However, these funds cannot be treated as a gain to Mr. Wolfe because they were intended and used to pay mortgages and finance improvements that would enhance and preserve the value of the collateral securing the loans, thus inuring directly to the benefit of lenders. Mr. Wolfe's "gain" from the scheme that supposedly was going to make him rich was *negative* $600,000 – the net loss he personally sustained – which dwarfed the losses of any of the lenders that the Government seeks to cast as his "victims."

In its efforts to demonize Mr. Wolfe, the Government refuses to acknowledge the expenses he incurred to make mortgage payments and upgrade the properties even as the housing market crumbled around him. At the Sentencing Hearing, the Government sought to downplay these expenditures by referring to anecdotal evidence from unnamed witnesses "who said, 'I lived there before and after the sale. There were no capital improvements to the place.'" Sent. Hearing Transcr. at 29. However, this claim is contradicted by the testimony of one of the Government's own witnesses, Daniel Savant, whose company managed 10 to 12 of the properties for Mr. Wolfe. Mr. Savant conceded

1  on cross-examination that the properties "needed a lot of work" when he started managing

2  them for Mr. Wolfe, and that Mr. Wolfe "spent a considerable amount of money [on]

3  these properties [to] get the work done."  *See* Trial Transcr. Day 7 at 37:11-22.  Similarly,

4  Andrew Bohuslavizki stated during one of his FBI interviews that "Wolfe put a lot of

5  money back into the properties."  *See* A. Bohuslavizki FBI 302 dated May 17, 2010, at 6

6  (Ex. F to Def's Sent. Posit.).

7          The Government's Reply Brief also fails to address the Court's question about the

8  ways in which Mr. Wolfe expected to make money from the scheme, *see* Sent. Hearing

9  Transcr. at 25, which might help establish "intended loss" in the event the Government is

10  unable to prove a higher actual loss.  *See* U.S.S.G. § 2B1.1 cmt. n.3(A) ("loss is the

11  greater of actual loss or intended loss").  The Government conceded at the Sentencing

12  Hearing that Mr. Wolfe, like any legitimate real estate investor, intended to make money

13  through the appreciation of the properties over time.  *See* Sent. Hearing Transcr. at 25-26

14  ("MR. SAGEL:  When Mr. Wolfe obtained all these loans and obtained all these

15  properties, he didn't know there was going to be a declining real estate market.  He

16  obviously thought the real estate market was going to keep going up in the same manner it

17  had been going at least for the five years prior to it.").  The Government's Reply Brief

18  also concedes, as it must, that Mr. Wolfe's actions were consistent with an intention to

19  pay back every cent of every loan.  *See* Gov't Reply Br. at 29 ("Defendant paid the

20  mortgages on all of the properties in this case after the close of escrow").  Therefore, there

21  can be no dispute that the intended loss in this case is zero.[4]  *See United States v. Shaw*, 3

22  F.3d 311, 314 (9th Cir. 1993) (intended loss is limited by "the extent to which, if at all,

23  [the defendant] subjectively intended to repay what he had borrowed"); *United States v.*

24

---

25  [4]        Mr. Wolfe's commitment to make good on the loans also serves to distinguish him
26  from the typical mortgage-fraud defendant who intends to default and make off with the
    proceeds.  *Cf. United States v. Curtis*, 635 F.3d 704 (5th Cir.), *cert. denied*, 132 S. Ct. 191
27  (2011) (straw buyers recruited by defendant "represented that they intended to repay the
    loans when in fact they did not," and defendant made off with "the lion's share of those
28  proceeds" after the loans closed).

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

1 *Crandall*, 525 F.3d 907, 914 (9th Cir. 2008) ("Defendants' fraudulent scheme was

2 intended to enhance the marketability and value of the apartments which were sold.

3 Defendants did not intend that the buyers would suffer any loss.  Hence, the loss, if any,

4 suffered by the buyers must be measured in terms of 'actual loss,' not intended loss.").

5   The Government suggests that if the Court rejects its loss calculation, it still could

6 treat the $2 million in "cash back" as intended loss and use that measure instead.  *See*

7 Gov't Reply Br. at 26 n.16.  The Government is mistaken.  If anything, the $2 million in

8 cash back arguably might represent a "gain" to Mr. Wolfe, but it does not constitute

9 "intended loss."  Gain, of course, is not available as a loss measure unless both actual *and*

10 intended loss are unascertainable.  *See* U.S.S.G. § 2B1.1 cmt. n.3(B) (gain serves as

11 alternative to loss "only if there is a loss but it reasonably cannot be determined").  By

12 mischaracterizing the $2 million as "intended loss," the Government is hedging its bets,

13 arguing for an actual loss of $8.8 million while leaving itself room to argue for an

14 intended loss of $2 million in the event the Court agrees with the defense that actual loss

15 is much lower.

16   The Government cannot have it both ways.  If it is unable to prove actual losses

17 exceeding $2 million, it cannot use the $2 million in cash back as an alternative measure

18 of loss simply by mischaracterizing it as "intended loss."  The Government is not allowed

19 to make up for the flaws in its actual-loss calculation by suggesting that it could have

20 selected a different loss measure instead.  *United States v. Laurienti*, 611 F.3d 530, 559

21 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 969 (2011) ("Having chosen to calculate actual

22 loss for a subset of victims tied to each Defendant, the government cannot now argue that

23 its flaws in calculation are irrelevant simply because it could have calculated loss

24 differently.").  The Government is stuck with actual loss, and its failure to prove even $1

25 million, let alone $8.8 million, of actual loss by clear and convincing evidence or even by

26 a preponderance of the evidence precludes the 20-level enhancement it seeks.

27

28

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

### III. THE LOSS AMOUNT MUST TAKE INTO ACCOUNT A DECLINING REAL ESTATE MARKET AND LENDERS' FAILURE TO MITIGATE THEIR LOSSES THROUGH SHORT SALES DESPITE MR. WOLFE'S PLEAS.

The Court also asked the Government to address whether and to what extent the loss amount may properly include losses attributable to (i) the historic and unforeseen crash of the real estate market between the time that the conspiracy ended and the properties were sold and (ii) the lenders' failure to mitigate their losses through short sales despite Mr. Wolfe's repeated pleas. *See* Sent. Hearing Transcr. at 12, 23-27, 30-32, 39. The answers to both inquiries turn on the same basic question: Whether and to what extent the loss amount in this case may be increased by forces external to the conspiracy, as opposed to Mr. Wolfe's acts and the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1) (defining universe of relevant conduct used to calculate a defendant's offense level).

In its Reply Brief, the Government does not directly address the Court's concern regarding the extent to which the real-estate market collapse was responsible for the losses claimed by the Government. The only reference to this issue in the Government's brief appears at the tail end of a case parenthetical regarding a different issue. *See* Gov't Reply Br. at 27-28 (citing *United States v. Davoudi*, 172 F.3d 1130, 1135 (9th Cir. 1999), for the proposition that the loss amount is the difference between the outstanding loan balance and the amount recovered upon sale of the property). Despite language in the 1999 *Davoudi* case that could be read as suggesting otherwise, the Court cannot and should not lay the entire weight of the real estate market collapse on Mr. Wolfe's shoulders for purposes of determining his Guidelines sentencing range. To do so would eviscerate U.S.S.G. § 2B1.1's requirement that actual loss be "reasonably foreseeable" to the defendant and § 1B1.3's requirement that the loss not exceed what is properly attributable to the defendant's relevant conduct. Multiplying Mr. Wolfe's offense level based on an historic and unprecedented downturn in the real estate market that almost no one could have foreseen would yield a Guidelines sentencing range untethered to any of the

legitimate purposes of sentencing.  Indeed, Ninth Circuit cases decided since *United States v. Davoudi*, 172 F.3d 1130, 1135 (9th Cir. 1999) have recognized the unfairness of attributing unrelated market fluctuations to a defendant for sentencing purposes.  *See, e.g., United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (noting that "there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in the punitive context"); *United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004), *cert. denied*, 546 U.S. 957 (2005) (same); *cf. United States v. Crandall*, 525 F.3d 907, 915 n.8 (9th Cir. 2008) ("The volatile nature of the real estate market is wholly independent of Defendants' actions and, for sentencing purposes, they should not benefit from [it].").

Moreover, the circumstances surrounding the lenders' losses in this case are fundamentally different from those in *Davoudi*.  When Mr. Wolfe was no longer able to afford mortgage payments, he approached lenders and affirmatively requested that they mitigate their losses by conducting short sales rather than letting the properties languish in a declining market.[5]  The lenders' failure to do so was not simply the result of "improvident management," *Davoudi*, 172 F.3d at 1135, but rather constituted an affirmative refusal to protect their own interests in the face of Mr. Wolfe's entreaties. While the lenders' inaction may not rise to the level of the "intervening criminal misconduct" that caused the Ninth Circuit to distinguish *Davoudi* in *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir.), *cert. denied*, 531 U.S. 1037 (2000), theirs was a conscious and deliberate choice that had the statistically probable effect of more than doubling the losses for which the Government now seeks to hold Mr. Wolfe solely

---

[5]     At the Sentencing Hearing, the Government insisted that there was "zero evidence" of Mr. Wolfe's efforts to persuade lenders to conduct short sales.  *See* Sent. Hearing Transcr. at 32.  However, the discovery provided by the Government before trial reflects numerous instances of these efforts.  *See, e.g.,* Letter from G. Wolfe to Countrywide Bank dated May 7, 2007 (attached hereto as Exhibit A); E-mail from Wolfe to A. Bohuslavizki dated Nov. 30, 2006 (attached hereto as Exhibit B); "Account Status Listing" for 41 Calle Careyes dated Nov. 20, 2008 (stating that "Borrower Requested Assistance" in the form of "Short Sale") (attached hereto as Exhibit C).

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

1   accountable.  *See* PSR dated Jan. 20, 2012, ¶ 21.

2   Finally, whether or not the Court takes the market's collapse into account in

3   calculating actual loss, it can and should exercise its discretion under 18 U.S.C. § 3553(a)

4   to find that the Government's proposed loss amount vastly overstates Mr. Wolfe's

5   culpability and would produce a sentence far out of proportion to his offense conduct.

6   **IV.   THE GOVERNMENT HAS FAILED TO PROVE BY A PREPONDERANCE**

7   **OF THE EVIDENCE THAT THE NUMBER OF VICTIMS IS 10 OR MORE.**

8   The Government's request for a two-level sentencing enhancement based on 10 or

9   more victims must be denied for at least two reasons.  First, because Mr. Wolfe, as

10  explained above, cannot be held responsible for any losses other than on the nine loans

11  obtained in his own name, the number of lenders who could potentially qualify as victims

12  *ipso facto* cannot exceed 10.  Second, even assuming that successor lenders' losses could

13  be included in the loss amount as a legal matter (which, as explained above, they cannot

14  be), these lenders still do not qualify as victims as a factual matter because the

15  Government has offered no evidence that any successor lender sustained an actual loss.

16  Under the Guidelines, unless a particular lender's losses are included in the loss

17  amount calculated under U.S.S.G. § 2B1.1, that lender cannot qualify as a "victim" for

18  purposes of the number-of-victims enhancement.  *See* U.S.S.G. § 2B1.1, cmt. n. 1

19  (defining "victim" as "any person who sustained any part of the actual loss determined

20  under subsection (b)(1)").  To arrive at its proposed total of 14 victims, the Government

21  simply assumes that if a particular property sold at foreclosure for less than the principal

22  balance on the loan, the difference necessarily was absorbed by the foreclosing lender.

23  *See* PSR dated Jan. 20, 2012, "Loss Calculation Table" at 21-22; Gov't Reply Br. at 28

24  (agreeing with PSR's loss calculation).  That logic has some appeal where the original and

25  foreclosing lender is the same entity, but that's not the case with most of the loans here.

26  Only three of the original lenders actually held onto the loans until foreclosure; the rest of

27  the loans were taken to foreclosure by successor lenders who may have received more in

28  the foreclosure sales than they paid to acquire the loans, thus ending up with a profit

1  rather than a loss.  The Court has no way of knowing which of the foreclosing successor

2  lenders made or lost money because the Government has never offered any evidence of

3  what any of them paid for the loans.  Muddying the picture even further, any given

4  foreclosing lender may have been only the last in a series of successor lenders who bought

5  and sold a loan on terms and conditions that have never been disclosed to this Court.

6      The Government's failure to present any evidence from which this Court may

7  determine which successor lenders, if any, sustained an actual loss precludes imposition

8  of the two-point sentencing enhancement.[6]

9  **V.    THE GOVERNMENT HAS PRESENTED NO EVIDENCE TO SUPPORT A**
       **RESTITUTION AWARD.**
10

11     Despite the Government's assurances to the Court that its Reply Brief would

12  address the "evidence" supporting its $7.5-million restitution request, *see* Sent. Hearing

13  Transcr. at 60, the brief devotes one conclusory paragraph to the subject and offers no

14  further facts or argument to support the claimed restitution amount.  *See* Gov't Reply Br.

15  at 45 (simply agreeing with PSR's restitution calculation); PSR ¶ 106.  The defense sees

16  no need to repeat the arguments in its Sentencing Position for why no restitution is

17  appropriate in this case, but does note that the Ninth Circuit has since relied on those same

18  arguments to vacate the restitution award in *United States v. Yeung*, 2012 WL 432289 (9th

19  Cir. Feb. 13, 2012).

20     The Government argued in *Yeung*, as it does here, that determining the restitution

21  amount is as simple as calculating "the difference between the unpaid principal balance of

22  the loans at the time of default . . . and the net proceeds from the sale of [each property] to

23

24  _____

    [6]     The Government's proposed enhancement for sophisticated means also fails
25  because, as discussed at the Sentencing Hearing, simple acts do not necessarily become
    complex or sophisticated merely because they are repeated.  *See* Sent. Hearing Transcr. at
26  51.  *See also United States v. Stewart*, 2007 WL 56714, at *1 (5th Cir. Jan. 9, 2007)
    (defendant's simple misstatements on loan applications and use of false statements of
27  assets, income and collateral to secure loans, even if repeated over a period of time, are
    insufficient to establish sophisticated means).
28

a third-party purchaser." *Id.* at \*3. The Ninth Circuit rejected that formula where, as is true of most lenders here, a purported "victim" is a successor lender that purchased the loan in the secondary market. For those lenders, loss is measured by the difference between (i) the price that the successor lender actually paid for the loan and (ii) the value of the collateral as of the date the successor lender "took control" of the property, which may be months or even years before the property was actually sold to a third party. *See id.* at \*9 (noting that district court "did not explain its reasoning as to why the sales price of the property months or years later" established the value of the collateral at the time the lender took control of it).

Because a successor lender may have paid less than was still owed on the loan, and because the property may have lost value between the foreclosure (when the lender presumably "took control" of the property) and the sale to a third party, no restitution may be ordered unless the Government proves both the amount actually paid by the successor lender to acquire the loan and the value of the collateral at the time the successor lender took title to it, and also proves that the difference between the two amounts was directly and proximately caused by the defendant's conduct. *Id*.

Here, the Government has not even begun to make the evidentiary showing required in *Yeung*. The only "evidence" in support of the Government's restitution request is a loss chart appended to the PSR that does no more than summarize figures provided to the Probation Office by the Government itself, and which compares two amounts – outstanding principal balance and proceeds of sale to a third party – that are incorrect benchmarks for calculating restitution. The lack of evidence is compounded by the Government's failure to produce a single purported "victim" who claims to have been harmed in any amount, let alone the $7.5 million in losses claimed by the Government. *See United States v. Andrews*, 600 F.3d 1167, 1175-76 (9th Cir. 2010) (citing *United States v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004) (vacating order of restitution that sought to compensate non-victim for failure of actual victims to claim restitution)). Under *Yeung*, the Court has no basis for calculating a restitution amount.

The Government's request for "a separate restitution hearing (possibly to include an evidentiary hearing)," *see* Gov't Reply Br. at 45, to fill the evidentiary vacuum should be rejected as too little, too late. The Government has had multiple opportunities during the sentencing process to provide the Court with evidence supporting its restitution request, but has resisted doing so at every juncture. At the Sentencing Hearing, for example, the Court asked the Government to address why "no victims have responded to the invitation to participate" in any restitution order. Sent. Hearing Transcr. at 59. The Government perfunctorily replied that it "would rely upon probation's amended report where they now provide for restitution," *id.*, adding that the Probation Office served "as an objective third-party" whose job it was "to determine who has been harmed and to what extent they've been harmed and to verify those loss amounts." *Id.* at 60.

The PSR itself, however, reveals that the Probation Office hardly served as an "objective third party" or that it verified anything. The only "evidence" in the PSR purporting to support a restitution award is the "Loss Calculation Table" attached to the back of the report. *See* PSR at 21-22. The PSR states plainly that the amounts in that table were provided to the Probation Office by the Government – not the other way around. *See* PSR at 6 n.1 (referring Court to "the attached loss calculation table provided to the Probation Officer by the government"). Moreover, the Probation Office was unable to "verify" any of the loss amounts because no lender responded to its invitation to claim, let alone document, a restitution amount in the 11 months since the verdict. The Government's restitution request must be denied in its entirety. *See United States v. Snipe*, 515 F.3d 947, 955 (9th Cir. 2008) (the Court "'may not simply rely on the factual statements in the PSR' to find that the government has carried its burden.") (quoting *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005)).

## VI.   THE COURT SHOULD EXERCISE ITS DISCRETION UNDER 18 U.S.C. § 3553(A) TO SENTENCE MR. WOLFE TO PROBATION OR A MINIMAL TERM OF INCARCERATION.

Whatever factual determinations this Court makes with respect to the proposed enhancements discussed above, the Guidelines are, in the final analysis, only one of the

1   factors this Court must consider in selecting a sentence "sufficient, but no greater than

2   necessary" to fulfill the objectives of sentencing. *See United States v. Autery*, 555 F.3d

3   864 (9th Cir. 2009) (stating that "while the Guidelines in this case called for a period of

4   incarceration, the Guidelines are only one of several factors the district court must

5   consider"). Defendant's Sentencing Position demonstrates that the enhancements sought

6   by the Government, individually and collectively, vastly overstate Mr. Wolfe's culpability

7   and cry out for an exercise of this Court's discretion under § 3553(a) to sentence Mr.

8   Wolfe to probation or, at most, a minimal term of incarceration.

9       In *Autery* and *United States v. Edwards*, 595 F.3d 1004 (Pregerson, J.), *rehearing

10  en banc denied*, 622 F.3d 1215 (9th Cir. 2010), the Ninth Circuit provides ample guidance

11  to district courts on how to apply § 3553(a) factors to a defendant in Mr. Wolfe's

12  circumstances. In *Edwards*, the defendant was sentenced to five years' probation after

13  pleading guilty to bankruptcy fraud and making a false statement to a bank. The district

14  court concluded that the loss amount "overstated the circumstances of [the] case" and that

15  the defendant's conduct in the nine years since the offense made it unlikely that he would

16  "engage in similar conduct in the future." *Id.* at 1010-11. As a result, there was "'nothing

17  to be gained based on the circumstances of the offense and defendant's history and

18  characteristics by incarcerating him.'" *Id.* at 1010.

19      Here, as in *Edwards*, the Government's proposed loss amount vastly overstates Mr.

20  Wolfe's culpability, and in the six years since his offense, Mr. Wolfe has demonstrated

21  that society has nothing more to fear from him. The Government contends that any

22  sentence short of imprisonment "would send the wrong message to white-collar

23  criminals," and that "nothing would stop defendant from attempting to commit further

24  fraud to obtain money, especially if he does not have to do jail time for his criminal

25  conduct." Gov't Reply Br. at 41. That same argument was made and rejected in

26  *Edwards*, where the defendant – unlike Mr. Wolfe – had even been previously convicted

27  of similar crimes and was on probation when he re-offended. While acknowledging that

28  general deterrence may be a proper consideration in white-collar criminal cases, the

district court in *Edwards* acted well within its discretion in concluding that deterrence was "not a significant factor 'in a case like this.'" *Id.* at 1016. "[T]he fact of [defendant's] felony conviction and the conditions of probation constituted sufficient specific deterrence to prevent [defendant] from engaging in similar conduct in the future."[7] *Id.* at 1011.

Similarly, in *Autery*, the Ninth Circuit affirmed a sentence of five years' probation instead of a lengthy Guidelines prison sentence for a child-pornography defendant based on the district court's application of the § 3553(a) factors. Although the district court believed that child pornography was "terrible stuff" and that the defendant "ordered it knowing that it was wrong and illegal," *id.* at 868, the Ninth Circuit held that the district court acted within its discretion in concluding that:

- The evidence, while sufficient to convict, set apart the defendant from the usual defendant convicted of the same offense, *id.* at 867-68;

- The defendant's complete lack of a criminal history was an additional mitigating factor even though the Government argued that the factor was duplicative because the defendant had already received the benefit of Criminal History Level I, *id.* at 874;

- The sentence "was not just a term of probation," but also was accompanied by a number of conditions that significantly restricted the defendant's freedom, *id.* at 875-76;

- The defendant's "positive characteristics" – including "no history of substance abuse, no 'interpersonal instability' nor 'sociopathic or criminalistic attitudes,' his motivation and intelligence, and that he has the support of his wife and children" – "increase[d] the likelihood that [he] can once again become a productive, non-threatening member of free society, thus making more severe

---

[7]      Among other things, those conditions required the defendant to obtain his probation officer's approval before engaging in transactions or accepting employment that "would give him access to money, bank or investment accounts, real or personal property, or inventory of any person or business entity." *Edwards*, 595 F.3d at 1011 n.2.

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

punishment less appropriate than if [he] lacked those characteristics, *id.* at 874;

- Incarceration "would *undermine* [the defendant's] rehabilitation, *id.* at 877 (emphasis in original);

- Given the defendant's "dissimilarity with others convicted of the same offense" who have received prison sentences, probation would not create any disparities in sentencing. *Id.* at 876.

The Ninth Circuit also found that the district court's warning to the defendant that any violation of the conditions of his probation would be met with the maximum penalty served as an effective deterrent: "It is said that there is nothing like being sentenced to hang in the morning to focus a man's thoughts, and it is improbable that the district court's stern warning will be an ineffective deterrent in this case." *Id.* at 876.

All of the factors that the Ninth Circuit found to be a proper exercise of the district court's discretion to impose probation in *Autery* are at least as applicable, if not more so, to Mr. Wolfe. The documentary evidence of Mr. Wolfe's guilt was inconsistent and weak, and although Mr. Bohuslavizki's testimony was obviously sufficient in the jury's mind to convict, it did not establish anything close to the level of culpability seen in most other mortgage-fraud cases. *See* Def's Sent. Posit. at 29-35. This is Mr. Wolfe's first and only offense. At 42, he is young enough to recover from this experience, learn from his mistakes, and lead a productive and meaningful life. He has paid dearly for his offense in innumerable ways, from the loss of his law and real estate licenses to the devastating financial, reputational, and psychological harm that he has suffered over the past six years. Imprisonment would set back, if not undermine, his rehabilitation. Mr. Wolfe is gainfully employed, has the love and support of a devoted wife and family, and has demonstrated through his exemplary conduct since the indictment that society has nothing to fear and much to gain from him. At a time when most defendants might have retreated from society and forsaken their obligations, Mr. Wolfe labored almost full-time for several months after the verdict to transition more than 100 of his clients to other lawyers, speaking personally with each client to help ease the transition and briefing the lawyers on

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION

the details of each matter to ensure that the clients' interests were protected.  *See, e.g.,* Letter from Mr. Beck (among the letters attached hereto as Exhibit E) and Letter from Mr. Nabi (attached to Defendant's Sentencing Position).

A sentence of probation would not mean that Mr. Wolfe would be "getting away with the offense," as the Government contends.  Gov't Reply Br. at 42.  The United States Supreme Court has made clear that probation should not be equated with "merely 'letting an offender off easily.'"  *Gall v. United States*, 552 U.S. 38, 48 (2007) (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13–14 (1957)).  Rather, it represents a "substantial restriction of freedom," *id.*, that would "carry significant punitive weight."  *Edwards*, 595 F.3d at 1017 n.9 (9th Cir. 2010).  As explained by the Supreme Court in *Gall*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. . . .  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. . . .  Most probationers are also subject to individual "special conditions" imposed by the court. . . .  "Often these conditions comprehensively regulate significant facets of their day-to-day lives . . . .  They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist."

*Gall*, 552 U.S. at 48-49 (citations omitted).

The Government continues to maintain that Mr. Wolfe should be subjected to harsher punishment because of his professional status as a lawyer at the time of the

offense.  This double standard has driven the investigation and prosecution of Mr. Wolfe

from day one.  Agent Whelan testified that Mr. Wolfe's status as a lawyer made the FBI

that much more determined to send him to prison.  Prosecutors never tired of calling the

jury's attention to the irrelevant fact that Mr. Wolfe was a lawyer – an obvious (and likely

successful) effort to incite the jury against him.  And now the Government employs the

same improper argument to urge a nine-year sentence for Mr. Wolfe even as it seeks a

sentence of no more than three years (and probably significantly less as a reward for

cooperating against Mr. Wolfe) for the scheme's far more culpable ringleaders, the

Bohuslavizkis.  Given this pattern, it is not difficult to deduce why the Government

decided to charge Mr. Wolfe under a conspiracy statute carrying a maximum sentence of

20 years (18 U.S.C. § 1349) while charging the Bohuslavizkis under a different

conspiracy statute carrying a maximum sentence of only five years (18 U.S.C. § 371) – a

decision the prosecution was unable to explain when the Court asked about it at the

Sentencing Hearing, and which the Government has not even attempted to explain in its

Reply Brief.[8]  Correcting this disparity is just one more reason for the Court to use its

departure power.[9]  *See United States v. Lieberman*, 971 F.2d 989, 998 (3rd Cir. 1992)

(stating that "a sentencing court may control *any* inappropriate manipulation of the

indictment through use of its departure power") (emphasis in original) (quoting United

States Sentencing Guidelines, Ch. 1, Pt. A, (4)(a), Policy Statement).

   While the Government cites no authority for holding attorneys to a higher standard

of conduct than other criminal defendants, Defendant's Sentencing Position cites

numerous authorities for the opposite proposition.  *See* Def's Mot. for Judgment of

Acquittal or, in the Alternative, for New Trial (Dckt. No. 77), at 11-12 (citing cases

holding that jury may not impute knowledge or intent to a fraud defendant merely because

---

[8]    It also helps explain why the Government gave a pass to a dozen or so co-
conspirators who were involved in the Bohuslavizkis' scheme but never charged.

[9]    Attached hereto as Exhibit D is a one-page chart comparing Mr. Wolfe's offense
conduct to that of the Bohuslavizkis.

he is a lawyer).  If anything, Mr. Wolfe's unblemished record as a practicing attorney in all the years preceding his offense should serve as a mitigating factor at sentencing and not the other way around.  In affirming a sentence of probation for the child-pornography defendant in *Autery*, the Ninth Circuit stated:

> The government also notes that [defendant] was a former reserve police officer and claims this fact should have been considered an aggravating factor, because [defendant] should have known the law and its consequences.  The notion that a defendant's status as a former law enforcement officer justifies a per se sentence enhancement is dubious.  Indeed, one could reasonably argue that a defendant's law enforcement service could, in certain circumstances, constitute a mitigating factor in sentencing because a former law enforcement officer has shown at some point in his past that he can lead an honorable and responsible life.  Defense counsel frequently use similar arguments before sentencing courts in order to highlight a defendant's best qualities.  Because the issue can cut either way, the district court's failure to treat such service as an aggravating factor was not an abuse of discretion.

*Autery*, 555 F.3d at 874.

The letters submitted to this Court by former clients and business associates of Mr. Wolfe – not to mention his friends, neighbors and family members – speak to the integrity and rectitude with which he conducted himself in the 10 years that he practiced law before

his unfortunate encounter with the Bohuslavizkis and in the six years since his offense.[10] Rather than be punished more severely because he was an attorney, Mr. Wolfe should receive consideration for all the years that his personal and professional conduct were above reproach.[11]

Dated:  April 9, 2012                          Respectfully submitted,

                                               BIENERT, MILLER & KATZMAN, PLC


                                               By: */s/ Luis A. Feldstein /s/*
                                               Luis A. Feldstein

                                               Attorneys for Defendant
                                               GERALD L. WOLFE

---

[10]     Several additional letters received after Defendant's Sentencing Position was filed are attached hereto as Exhibit E.  The Government also has submitted letters to the Court from a handful of people who have a longstanding animus towards Mr. Wolfe and are cynically trying to manipulate his sentencing to gain leverage over him in pending civil litigation.  The Government goes out of its way to insist that it played no role in encouraging this sudden and improper attempt to influence Mr. Wolfe's sentencing by individuals who regularly attended the trial.  The defense will not dignify the letters with a substantive response, but merely notes that none of the letter-writers or their allegations have anything to do with the transactions at issue here.  This is not the appropriate forum for non-victims of Mr. Wolfe's offense to pursue their personal agendas.

[11]     The Government's repeated characterizations of Mr. Wolfe as the Bohuslavizkis' lawyer, *see* Gov't Reply Br. at 5 n.3, 24, 43, is an obvious attempt to create a nexus between his offense conduct and his professional status that simply did not exist.  Mr. Wolfe's limited legal work on behalf of the Bohuslavizkis – setting up a corporation and reviewing business contracts, as evidenced by the billing statements introduced at trial, *see* Gov't Ex. 188 – was completely unrelated to the property purchases and loans at issue in this case.

## CERTIFICATE OF SERVICE

I, Coleen Grogan, declare,

That I am a citizen of the United States and am a resident or employed in Orange County, California; that my business address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673; that I am over the age of 18 and not a party to the above-entitled action.

That I am employed by a member of the United States District Court for the Central District of California and at whose direction I caused service of: DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING POSITION on the interested parties as follows:

**X      BY ELECTRONIC MAIL:** by electronically filing the foregoing with the Clerk of the District Court using its ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

AUSA Joseph T. McNally                    AUSA Brett A. Sagel
Office of US Attorney  Criminal Div       Office of US Attorney  Criminal Div
Joseph.mcnally@usdoj.gov                  Brett.sagel@usdoj.gov;
                                          USACAC.SACRiminal@usgov

**X      BY OTHER MEANS:** I am "readily familiar" with Bienert, Miller & Katzman, PLC's practice for collecting and processing mail with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  As such, I caused to be mailed the foregoing document(s) to the following non-ECF participants in this case:

Gregory Vidaña
United States Probation Officer
411 West Fourth Street, Suite 4170
Santa Ana, CA 92701

This certificate was executed on April 9, 2012 at San Clemente, California.

I certify under penalty of perjury that the foregoing is true and correct.

_S/ Coleen Grogan_____
Coleen Grogan

DEFENDANT GERALD L. WOLFE'S RESPONSE TO GOVERNMENT'S REPLY TO
DEFENDANT'S SENTENCING POSITION